PENNY BAKER, ADMINISTRATRIX OF
THE ESTATE OF BRANDON BAKER                                      PLAINTIFF

v.

MADISON COUNTY FISCAL
COURT., *et al.*                                                          DEFENDANTS

---

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## THE SECOND AMENDED COMPLAINT

---

      Come Defendants Madison County Fiscal Court and Steve Tussey, individually and in his official capacity as Madison County Jailer (together the "Madison County Defendants"), by counsel, and for their Memorandum in Support of their Motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss with prejudice the Second Amended Complaint and all claims asserted against them herein by the Plaintiff, Penny Baker, Administratrix of the Estate of Brandon Baker (the "Estate"), respectfully state as follows:

### INTRODUCTION

      The Estate of Brandon Baker alleges he died as a result of not receiving adequate medical attention while he was an inmate at the Madison County Detention Center and that the Madison County Fiscal Court and Madison County Jailer are responsible because they did not adequately train the deputy jailers who interacted with Baker. However, the Second Amended Complaint does not contain any facts in support of the Estate's theory of liability and actually asserts facts directly refuting the Fiscal Court and Jailer's liability, and its claims against them therefore must be dismissed.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>[1]

According to the Second Amended Complaint, Brandon Baker was booked into the Madison County Detention Center ("MCDC") on July 18, 2023, for public intoxication and possession of a controlled substance. Second Amended Complaint, D.E. 18, Page ID# 232, ¶ 24. He had a history of polysubstance abuse and hepatitis C. *Id.* Allegedly, while Baker was incarcerated at the MCDC, "MCDC staff" failed to in-person surveil him "both in terms of frequency as well as sufficiency." *Id.* at Page ID# 233, ¶¶ 27-30.

Per the Second Amended Complaint, video surveillance footage shows Baker appearing unwell and struggling to stand up to exit his cell at 8:55 a.m. that day, and a guard lent his arm to Baker to pull himself up. *Id.* at ¶ 27. A guard brought Baker a change of pants at 9:12 a.m. because he had defecated on himself. *Id.* at Page ID# 234, ¶ 28. Early the next morning, Baker again had trouble getting up, which a guard acknowledged; after the guard tried to assist Baker, he retrieved a wheelchair before exiting the cell with Baker. *Id.* at ¶ 30. Baker did not eat dinner that evening or breakfast the next morning. *Id.* at ¶¶ 32, 35. Baker began vomiting at 7:07 a.m.; he asked one of his cellmates to get a guard for him, and two minutes later a guard came to the cell. *Id.* at Page ID# 235, ¶ 37. Another inmate told guards at 8:55 a.m. that Baker needed medication, but none was provided. *Id.* at ¶ 38. Baker did not eat lunch that day. *Id.* at ¶ 39.

At 1:52 a.m. on July 21, 2023, another inmate called for guards because Baker was "violently ill" and was vomiting and defecating on himself. *Id.* at ¶ 42. Another inmate tried again to summon a guard and yelled, "I mean, what's it take to get you to call a fucking ambulance?" *Id.* A guard asked via intercom for the sick inmate's name, and the inmates responded. *Id.* One of Baker's cellmates called for help again at 2:07 a.m., "kicking the door

---

[1] For the purpose of this Motion only, the Madison County Defendants assume the well-pled facts in the Second Amended Complaint are true. However, the Madison County Defendants in no way concede or waive their right to challenge the truth of those allegations in any future proceedings if their Motion is denied.

2

and screaming." *Id.* at ¶ 43. Two guards entered the cell four minutes later, and one left briefly and returned with a change of clothes for Baker. *Id.* at Page ID## 235-36, ¶ 43. The guards spoke with the inmates in the cell, who told them "that nobody has been to check on Mr. Baker in two days and that they have let Mr. Baker lay in bed and starve." *Id.* The guards left the cell without responding, but at 2:19 a.m. they returned with a wheelchair, took Baker out of the cell, and moved him to an isolation cell. *Id.*; *id.* at Page ID# 236, ¶ 44.

Mr. Baker did not eat breakfast the morning of July 21, 2023. *Id.* at ¶ 46. A guard came to the cell and gave him medication and checked his blood pressure at 7:18 a.m. *Id.* at ¶ 48. Mr. Baker fell out of the chair he had been sleeping on at 9:36 a.m.; another inmate removed the chair, which had fallen on top of Baker, while Baker remained unmoving and appeared to be unconscious. *Id.* at ¶ 49. A nurse called through the door to check on Baker at 10:55 a.m.; when Baker did not respond, the nurse and two guards entered the cell and asked Baker if he was coming off of anything, to which he responded, "Yes, suboxone." *Id.* at ¶ 50. The nurse and guards then checked Baker's heart rate and blood pressure and left the cell. *Id.* at Page ID# 237, ¶ 50. Baker did not eat lunch or dinner on July 21, 2023. *Id.* at ¶¶ 51, 52.

Baker did not eat breakfast on July 22, 2023, and he ate only one bite of his lunch before giving it to his cellmate. *Id.* at ¶¶ 54, 56. Baker's cellmate called for a guard at 4:34 p.m. and said Baker needed to see a nurse because he was having seizures. *Id.* at ¶ 57. The guard spoke with Baker, told him he was on the detox list, and asked him what symptoms he was having, then left and returned "a moment later" with medication. *Id.* As Baker was taking the medication, the guard told him, "Heroine's [sic] terrible coming off it, it is terrible, you feel like your [sic] gonna die but you won't." *Id.* As with his lunch, Baker gave his dinner to his cellmate after taking a

bite.  *Id.* at ¶ 58.  He was never seen by medical staff on July 22, 2023.  *Id.* at Page ID# 238, ¶ 60.

On July 23, 2023, Baker yelled for a guard at 3:03 a.m., but it took several attempts to get their attention.  *Id.* at ¶ 61.  Both Baker and his cellmate claimed they had been asking for water for hours with no response.  *Id.*  Two guards came into the cell and argued with Baker's cellmate before leaving.  *Id.*  At 4:15 a.m., Baker asked his cellmates to help him up because he could not move; one of his cellmates tried to do so but struggled, so a guard came in and helped the other inmate sit Baker up against the bed.  *Id.* at ¶ 62.  Baker did not eat breakfast that morning.  *Id.* at ¶ 63.  A nurse brought Baker medication at 8:42 a.m. and asked if he was feeling better; he said he was not.  *Id.* at ¶ 65.  Baker did not eat lunch or dinner on July 23, 2023.  *Id.* at Page ID## 238-39, ¶¶ 66-67.

Early on July 24, 2023, one of Baker's cellmates called for a guard, and one responded three minutes later.  *Id.* at Page ID# 239, ¶ 69.  The cellmate explained he did not want to have to step over Baker, who was lying on the floor, to use the bathroom.  *Id.*  The guard asked Baker to move, but Baker said he could not.  *Id.*  Once the cellmate became belligerent and threatened to put his hands on Baker, the guard said he would come back and move Baker, and he did so five minutes later.  *Id.*  When breakfast was served, the guard who brought it asked Baker if he was eating breakfast, and he said no.  *Id.* at ¶ 70.  The guard asked if he needed medical attention, and he said yes, although he could not specify what was wrong other than he needed "help."  *Id.*  The guard apparently left and returned to the cell and asked again what was wrong, and Baker said he did not know but could not move or eat.  Another guard asked Baker if he would like his tray, and he declined.  *Id*. at ¶ 71.  The second guard said he would send the nurse in when she arrived.  *Id.*  The same female guard who served breakfast also served lunch and dinner, which

Baker did not eat. *Id.* at Page ID# 240, ¶¶ 73-74. A different guard asked Baker at 7:15 p.m. if he was okay; Baker said he was not and told the guard "everything" was wrong. *Id.* at ¶ 76. The guard left, and a nurse never came to check on Baker that day. *Id.*

At 5:42 a.m., on July 25, 2023, a guard came into Baker's cell with breakfast, stepping over him several times to hand out trays without acknowledging him. *Id.* at ¶ 77. A nurse came to check on Baker at 8:02 a.m., assessed his vital signs, and asked if he was still unwell, to which he responded in the affirmative. *Id.* at ¶ 78. EMTs arrived at 8:47 a.m. and removed Baker from his cell; he was lying in his own urine and feces, hypothermic, tachypneic, and tachycardic. *Id.* at ¶ 79. Baker died in the hospital on August 15, 2023, due to complications from Methicillin-resistant Staphylococcus aureus (MRSA) endocarditis due to intravenous drug abuse with "medical neglect" listed as a contributing factor. *Id.* at Page ID## 240-41, ¶ 80.

On September 19, 2023, Michelle Stringer with the Kentucky Department of Corrections ("DOC") sent Jailer Tussey a letter informing him she had investigated Baker's death and determined Kentucky jail standards were violated. *Id.* at Page ID# 241, ¶ 81. Tussey responded with a letter outlining a plan to coach the shifts involved in Baker's incarceration on the importance of proper observation and reiterating that jail staff are trained on observation procedures during annual in-service. *Id.* at ¶ 82.

The Plaintiff, Penny Baker, was appointed Administratrix of Baker's Estate on September 27, 2023. *Id.* at Page ID# 229, ¶ 3. She filed a Complaint in Madison Circuit Court on August 14, 2024, naming as defendants the Madison County Fiscal Court, Steve Tussey, individually and in his official capacity as jailer, West Kentucky Correctional Healthcare, LLC ("WKCH"), Unknown Jail Guards, and Unknown WKCH medical doctors, nurses, and/or staff. The Madison County Defendants removed the case to federal court on September 9, 2024. *See*

Notice of Removal, D.E. 1. After the WKCH Defendants filed an Answer and the Madison County Defendants filed a Motion to Dismiss, the Estate filed the Amended Complaint adding as defendants several MCDC employees. *See* Amended Complaint, D.E. 7. The Madison County Defendants moved to dismiss the Amended Complaint, and the Estate filed a motion to amend the Complaint a second time, which the Court granted on November 13, 2024. *See* Motion to Dismiss Amended Complaint, D.E. 11; Order dated Nov. 13, 2024, D.E. 17. The Second Amended Complaint asserts claims against all defendants under 42 U.S.C. § 1983 for deliberate indifference to Baker's serious medical needs and municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Estate also asserts claims under state law against all defendants for negligence *per se*, against the individual and unknown defendants for negligence/gross negligence/wrongful death, and against WKCH and its unknown employee defendants for medical negligence. *See generally* Second Amended Complaint, D.E. 18, Page ID## 227-248.

## ARGUMENT

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the Complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The complaint should be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (quoting *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004)). "In order to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotations omitted); *see also Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (quoting

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007)) (complaint "'must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory'"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Additionally, allegations made "based on nothing more than a plaintiff's beliefs are 'naked assertions devoid of further factual enhancement' that are insufficient to state a claim." *El-Hallani v. Huntington Nat'l Bank*, 623 Fed. App. 730, 735 (6th Cir. 2015) (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 506 (6th Cir. 2013)). Applying this standard, the Estate's claims against the Madison County Defendants must be dismissed for failure to state a claim upon which relief may be granted.

I.     **The Second Amended Complaint does not allege facts sufficient to state a plausible § 1983 claim against Jailer Tussey in his individual capacity.**

The Estate alleges Jailer Tussey is a citizen and resident of Madison County, and as the elected Madison County Jailer, he was responsible for (1) adopting and administering the MCDC's policies and procedures, (2) ensuring the safety and well-being of MCDC inmates, and (3) providing adequate supervision of MCDC inmates. *See* Second Amended Complaint, D.E. 18, Page ID# 230, ¶¶ 9-11. Although the Estate does not claim Jailer Tussey personally interacted with Baker, it avers, upon information and belief, that Jailer Tussey knew or should have known about his staff's alleged deliberate indifference toward Baker yet "approved, ratified, condoned, encouraged, sought to cover up, and / or tacitly authorized the continued" misconduct. *Id.* at Page ID# 243, ¶¶ 95-97. Finally, the Estate claims Jailer Tussey's training program was "inadequate to train [his] employees to carry out their duties" and he "failed to adequately train, supervise and discipline [his] employees, which "amounted to deliberate indifference to the fact that inaction would obviously result in the violation of the right to

treatment for a serious medical need" and caused the violation of Baker's right to medical care and his death. *Id.* at Page ID## 243-44, ¶¶ 98-101. The Estate's allegations fall far short of stating a plausible claim against Jailer Tussey for either direct deliberate indifference liability or supervisory liability.

A. <u>The Estate's deliberate indifference claim against Jailer Tussey fails because the Estate does not allege any facts demonstrating he knew or should have known Baker needed medical treatment.</u>

Claims for deprivation of adequate medical care are evaluated under the Fourteenth Amendment deliberate indifference framework. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315-317 (6th Cir. 2023). The Sixth Circuit requires the plaintiff to show:

> "(1) that [the plaintiff] had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

*Id.* at 317 (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (internal quotations in Brawner omitted)).

The Estate's Second Amended Complaint is devoid of any facts connecting Jailer Tussey personally to Baker's condition or the care he received during his incarceration. Instead, per the Second Amended Complaint, the only individuals who interacted with Baker at the MCDC were guards and nurses and Baker's cellmates. The Estate also does not allege any facts from which it can be inferred that Jailer Tussey otherwise learned of Baker's complaints, symptoms, or requests for help or that the response by security and medical staff was not adequate. There is therefore no factual basis in the Second Amended Complaint on which it would be plausible to conclude Jailer Tussey acted deliberately and recklessly in the face of an unjustifiably high risk of which he either knew or should have known, as required to plausibly allege deliberate indifference under the Fourteenth Amendment. *Cf. Jones v. Kenton Cnty., Ky.*, 2024 WL

1705210 (E.D. Ky. Apr. 19, 2024) (dismissing claim against jailer for deliberate indifference to risk of harm created by cell assignment where "the plaintiff fail[ed] to allege in the Complaint how Jailer Fields contributed to the placement decision"); *Villo v. Cnty. of Kent*, 2024 WL 2859295 (W.D. Mich. June 6, 2024) (finding allegation that defendant "was notified, appreciated the severity of [the inmate's] medical condition, but nothing was done," was not sufficient to state plausible claim for deliberate indifference where complaint did not contain any "facts as to how [the defendant] was notified or of what [the defendant] was notified"). The Estate's deliberate indifference claim against Jailer Tussey should therefore be dismissed.

B. <u>The Estate's supervisory liability claim against Jailer Tussey fails because it does not allege any facts showing he was involved in misconduct by his subordinates.</u>

To "ensure that no defendant is improperly held liable for the conduct of another," a § 1983 "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Aspey v. Chester Twp.*, 608 Fed. App. 335, 339 (6th Cir. 2015); *Iqbal*, 556 U.S. at 676. Thus, the plaintiff "must point to a specific action of each individual supervisor…." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008). This means that "§ 1983 liability must be based on more than respondeat superior, or the right to control one's employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Additionally, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Id.* (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998)). Instead, to be liable for a subordinate's misconduct, the supervisor must have "'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)). Finally,

"the defendant's execution of his job function must have caused the plaintiff's injury." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021).

Several principles flow from these well-established limitations on supervisory liability. For example, failing to investigate or discipline a subordinate for constitutional violations is "insufficient to make supervisors liable for their subordinates' conduct." *Frodge v. City of Newport*, 501 Fed. App. 519, 532 (6th Cir. 2012); *Wingo v. Tenn. Dep't of Corrs.*, 499 Fed. App. 453, 455 (6th Cir. 2012). Even when a supervisor learns of an ongoing constitutional violation and fails to take remedial measures, supervisory liability under § 1983 does not attach. *Shehee*, 199 F.3d at 300. To illustrate, in *Shehee*, an inmate claimed he refused to participate in a "kickback scheme" with a prison guard, and the guard retaliated against him with administrative detention and firing him from his desirable job working in the prison commissary. *Id.* at 297-298. The inmate pursued administrative remedies, including multiple appeals, but none of the officials who reviewed the issue addressed his retaliation claim. *Id.* at 298. "[T]he district court found that [the supervisors] knew of the alleged violations against [the inmate], but failed to act when the situation was in their control" and "held that this failure to act constituted an acquiescence in the unconstitutional conduct." *Id.* at 300. But the Sixth Circuit disagreed: "In the present case, Shehee's only allegations against [the supervisors] involve their denial of his administrative grievances and their failure to remedy the alleged retaliatory behavior…. There is no allegation that any of these defendants directly participated, encouraged, authorized or acquiesced in the claimed retaliatory acts against Shehee…." *Id.*; *see also*, *e.g.*, *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) (holding supervisors who were aware of sexual harassment but allegedly did not respond adequately could not be subject to supervisory liability); *Edwards v. Warren Cnty. Reg'l Jail*, 2018 WL 445115, at *5 (W.D. Ky. Jan. 16, 2018) (citing *Shehee*, 199

F.3d at 300) ("a prison official cannot be liable under § 1983 … for failing to remedy alleged unconstitutional behavior, …. even if the supervisors have actual knowledge of the alleged unconstitutional violation, … and even if the supervisors were involved in denying a grievance which raised the alleged constitutional violations"); *King v. Zamiara*, 2009 WL 1067317, at *1-2 (W.D. Mich. Apr. 21, 2009) (reviewing Sixth Circuit cases and holding "an official is not subject to supervisory liability for mere failure to act, even where that failure to act includes failure [to] remedy the ongoing effects of a constitutional violation").

The only actions attributed to Jailer Tussey in the Second Amended Complaint are (1) receiving a letter from the DOC sent 35 days after Baker died communicating its finding that Kentucky Jail Standards were violated "regarding the Brandon Baker incident," and (2) responding to the DOC that, in addition to annual in-service training all staff attend that addresses "the proper procedure for observations," personnel involved in "the Brandon Baker incident" would be "[c]oached on the importance of prompt observation[.]" *See* Second Amended Complaint, D.E. 18, Page ID## 240-41, ¶¶ 80-82. Initially, the violation of state jail standards does not amount to a constitutional violation as required to impose liability under § 1983. *E.g.*, *Farris v. Oakland Cnty., Mich.*, 96 F.4th 956, 968 (6th Cir. 2024); *Pyles v. Raisor*, 60 F.3d 1211, 1214-15 (6th Cir. 1995); *Shine-Johnson v. Chambers-Smith*, 2023 WL 3881754, at *2 (S.D. Ohio June 8, 2023); *Brown v. Boone Cnty., Ark.*, 2014 WL 4404973, at *5 (W.D. Ark. July 25, 2014). Further, even if jail standards could form the basis for a § 1983 claim, the DOC letter does not indicate Jailer Tussey himself violated applicable standards, nor does it suggest he knew about the violations at the time such that he could have authorized, approved, or acquiesced in them. *See*, *e.g.*, *Hoskins v. Knox Cnty.*, 2020 WL 1442668, at *32 (E.D. Ky. Mar. 23, 2020) (emphasis in original) (holding supervisor could not be held liable for subordinate's

misconduct where the record did "not even support that [the supervisor] was actually aware of [the subordinate's] misconduct throughout *this* investigation"); *Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, 520 Fed. App. 341, 348 (6th Cir. 2013) (supervisor who obtained search warrant, conducted risk assessment, and decided to employ SWAT team could not be liable for alleged constitutional violations by members of SWAT team where "[h]e was not present when they secured the … home and he did not instruct them as to the level of force they should employ"). And nothing Jailer Tussey did or did not do more than a month after Baker died could possibly be deemed to have caused any violation of Baker's constitutional rights. *E.g.*, *Watson v. Rees*, 2022 WL 16959233, at *5 (W.D. Mich. Nov. 16, 2022) (stating "[a]fter-the-fact approval of a subordinate's course of action, which does not itself cause the alleged harm, is insufficient to establish a claim for supervisory liability," and holding plaintiff failed to state plausible claim against supervisor who allegedly improperly investigated a grievance against correctional officers for excessive force and embellished his report in favor of the officers could not be liable where "there is no allegation that [the supervisor] caused any incident of excessive force").

If anything, the situation presented by the Second Amended Complaint is akin to *Colvin v. Caruso*, in which the Sixth Circuit held a supervisor whose only involvement in the events underlying the plaintiff's claims was directing that an inmate who had mistakenly been denied kosher meals and served nonkosher food be placed on a kosher diet as soon as possible after he learned of the mistake could not be individually liable under § 1983. 605 F.3d 282, 292 (6th Cir. 2010). Likewise, the Second Amended Complaint acknowledges Jailer Tussey responded to the DOC letter that all staff were trained on inmate observations annually and implemented a plan to coach the officers who reportedly did not meet the applicable standards with regard to Baker. It does not allege any facts supporting the conclusion that Jailer Tussey took any part in the

supposed deprivation of Baker's rights, and merely paraphrasing the types of participation that can lead to supervisory liability and "correctly recit[ing] the elements of a claim" is not sufficient to state a plausible claim where "those elements are not substantiated by any of the factual allegations in the Complaint." *Sanders v. Bottom*, 2016 WL 740429, at \*3-4 (E.D. Ky. Feb. 24, 2016) (dismissing individual-capacity failure-to-train to claim); *see also Iqbal*, 556 U.S. at 678.

C. <u>Since the Second Amended Complaint does not contain facts showing Jailer Tussey violated Baker's clearly established rights, the individual-capacity § 1983 claim against him is barred by qualified immunity.</u>

When county officers are sued under § 1983 in their individual capacity, qualified immunity is implicated. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Qualified immunity "is a defense not just against liability, but against suit itself." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Accordingly, immunity questions should be resolved "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232. "Qualified immunity ordinarily applies unless the contours of the asserted right were sufficiently clear that every reasonable official would have known what he was doing violated that right." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

To defeat qualified immunity at the motion to dismiss stage, the plaintiff must allege "facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson*, 790 F.3d at 653 (citing *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)). Stated another way, "the allegations must demonstrate that each defendant officer, through his or her own individual actions, *personally* violated plaintiff's rights under clearly established law." *Id.* (emphasis in original) (citing *Iqbal*, 556 U.S. at 676; and *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014)); *see also Spigelman v. Samuels*, 2015

WL 1411942, at *7 (E.D. Ky. Mar. 26, 2015) ("[A] plaintiff must describe how each defendant acted, personally, to deprive the plaintiff of his constitutional rights. Bare conclusory allegations that a defendant personally deprived a plaintiff of constitutional or statutory rights are insufficient to state a claim.") "'Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Johnson*, 790 F.3d at 653 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Further, when qualified immunity is raised, the plaintiff bears the burden of showing the right at issue was clearly established and "to do so must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell v. City of Southfield, Mich.*, 37 F.4th 362, 367 (6th Cir. 2022). "For a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Id.* at 368 (emphasis in *Bell*) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)).

As set forth above, the Estate has not pled facts plausibly making out a claim that Jailer Tussey violated Baker's rights at all, let alone facts under which any reasonable jailer would have known his conduct was unconstitutional. Accordingly, the Estate's claims against Jailer Tussey should be dismissed on the basis of qualified immunity.

II.     **The Second Amended Complaint does not allege facts sufficient to state a plausible claim against Jailer Tussey in his official capacitor the Fiscal Court for municipal liability under *Monell*.**[2]

The Estate alleges the MCDC is a department of the Fiscal Court, which "was responsible for providing staffing, supervision, and control over the MCDC," developing and implementing MCDC policies, and training and supervising MCDC employees with regard to the jail's policies and procedures. Second Amended Complaint, D.E. 18, Page ID## 229-30, ¶¶ 4-7. As with Jailer Tussey, the Estate alleges, upon information and belief, that the Fiscal Court knew or should have known about and approved or authorized the guards' allegedly unconstitutional conduct and avers the Fiscal Court had an inadequate training program and was deliberately indifferent to the failure to adequately train jail employees, which resulted in violations of Baker's constitutional rights and ultimately his death. *Id.* at Page ID## 243-44, ¶¶ 95-101. More specifically, the Estate alleges the "pattern and practice of misconduct as described by Michelle Stringer," *i.e.*, of violations of Kentucky Jail Standards regarding inmate observations, "was a direct and proximate cause of Mr. Baker's death." *Id.* at Page ID# 243, 244, ¶¶ 96, 103.

A government entity can be responsible for a deprivation of rights only if it occurred because of a governmental "custom" or "policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). In addition, "local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (emphasis in original) (internal quotation and citations

---

[2] The Estate's claims against Jailer Tussey in his official capacity are deemed to be against Madison County. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity…. It is *not* a suit against the official personally, for the real party in interest is the entity."); *Alkire v. Irving,* 330 F.3d 802, 810 (6th Cir. 2003) ("Individuals sued in their official capacities stand in the shoes of the entity they represent.").

omitted).  To adequately plead a claim under *Monell*, "a plaintiff's 'complaint must contain more than mere labels, conclusions, and the elements of his cause of action' but actually 'identify and describe the official policy or custom that resulted in a constitutional violation.'"  *French v. Hester*, 585 F. Supp. 3d 974, 986 (E.D. Ky. 2022) (quoting *Horn v. City of Covington*, 2015 WL 4042154 at *4 (E.D. Ky. July 1, 2015)); *accord Vidal v. Lexington Fayette Urban Cnty. Gov't*, 2014 WL 4418113, at *3 (E.D. Ky. Sept. 8, 2014) (requiring "more than bare statements that the alleged constitutional violation was caused by a policy or custom to survive a motion to dismiss"); *Kustes v. Lexington-Fayette Urban Cnty. Gov't*, 2013 WL 4776343, at *5 (E.D. Ky. Sept. 3, 2013) (to state a claim under *Monell*, the complaint "must describe what the official custom or policy was and describe how it" violated the plaintiff's rights).

Applying this standard, "[t]his district has repeatedly granted motions to dismiss § 1983 claims when the plaintiff does not provide factual support or merely recites the legal requirements for *Monell* liability."  *French*, 585 F. Supp. at 986 (collecting cases and dismissing municipal liability claim based on "conclusions, with no references to any specific customs").  For example, in *Charles v. Lee County*, this Court found allegations that (1) there was a widespread practice of failing to treat inmates' obvious serious medical conditions, (2) the jail had a practice of allowing non-medical staff to diagnose and treat medical problems, and (3) the defendants did not adequately train subordinates to respond to serious medical situations and "acquiesced in, endorsed, and ratified their subordinates' failure to treat obviously serious medical conditions" were "the type of legal conclusions, couched as factual assertions, that are insufficient to survive a motion to dismiss."  2020 WL 5369932 at *6-7 (E.D. Ky. Sept. 8, 2020).

The only well-pled fact cited in support of the Estate's *Monell* claim is that the DOC found Kentucky Jail Standards were "violated regarding the Brandon Baker incident," which it

characterizes as describing a "pattern and practice" of insufficient observation. Second Amended Complaint, D.E. 18, Page ID## 241, 243, 244, ¶¶ 81, 96, 103. However, the Estate's reliance on the DOC letter suffers multiple fatal flaws in the § 1983 context. First, the violation of state law cannot form the basis for liability under § 1983, which applies only to breaches of federal law. *E.g.*, *Farris*, 96 F.4th at 968; *Pyles*, 60 F.3d at 1214-15; *Shine-Johnson*, 2023 WL 3881754, at *2; *Brown*, 2014 WL 4404973, at *5. And even if it could, the DOC letter refers **only** to "the Brandon Baker incident," and a single incident of allegedly unconstitutional conduct is not enough to establish *Monell* liability, which must be based on "a clear and persistent pattern of illegal activity." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005); *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016). Additionally, a municipality can be liable for a pattern of unconstitutional conduct only if it was deliberately indifferent to it. *Thomas*, 398 F.3d at 433; *Bickerstaff*, 830 F.3d at 402. But the Estate does not allege any previous instances of inadequate observation to which the jail did not adequately respond, and in this instance, it expressly acknowledges that Jailer Tussey responded to the DOC's finding by retraining the officers involved.

The sole fact the Estate pleads in support of municipal liability is that the DOC determined jail staff violated state standards with regard to Baker, which falls far short of its burden to allege the existence of a pattern of constitutional violations about which Madison County knew and to which it was deliberately indifferent. *See Thomas*, 398 F.3d at 433; *Bickerstaff*, 830 F.3d at 402. The remaining recitations of legal standards masquerading as factual allegations cannot fill the void; the Estate's *Monell* claim should therefore be dismissed.

**III. The Second Amended Complaint does not state a plausible claim under Kentucky law against Jailer Tussey in his individual capacity.**

To establish negligence or negligence *per se* under Kentucky law, the plaintiff must show the defendant owed a duty, the duty was breached, and a causal connection between the breach and the injury suffered. *Mullins v. Comm. Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992); *Young v. Carran*, 289 S.W.3d 586, (Ky. App. 2008) (quoting *Real Estate Mktg., Inc. v. Franz*, 885 S.W.2d 921, 926-27 (Ky. 1994)) ("Negligence *per se* 'is merely a negligence claim with a statutory standard of care.'"). Failure to establish any of these elements is fatal to a plaintiff's claim. *M & T Chems., Inc. v. Westrick,* 525 S.W.2d 740, 741 (Ky. 1974). Gross negligence and wrongful death require something **in addition to** negligence. To escalate from negligence to gross negligence, a plaintiff must show "that [the] negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others." *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013); *see also Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003) (quoting *Cooper v. Barth,* 464 S.W.2d 233 (Ky. 1971)) (gross negligence requires "'an element either of malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious or willful'"). A claim for wrongful death lies when the defendant's negligent or wrongful act results in another person's death. KRS 411.130.

Importantly, "[i]t has long been established that there is no vicarious liability on the part of a public official for acts of subordinates in which the official was not directly involved." *Franklin Cnty. v. Malone*, 957 S.W.2d 195, 199 (Ky. 1997) (overruled on other grounds by *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001)). Thus, in the absence of any allegations attributing wrongdoing to Jailer Tussey personally, the Second Amended Complaint fails to state a plausible claim against him under state law.

Jailer Tussey in his individual capacity owed "a duty of reasonable care to inmates in his custody." *McCallister v. Riley*, 2016 WL 3136278, at *6 (Ky. App. June 3, 2016) (citing *Sudderth v. White*, 621 S.W.2d 33, 35 (Ky. App. 1981)); *see also Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006), *as corrected* (Sept. 26, 2006) ("The law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody."). But a jailer "'cannot be charged with negligence in failing to prevent what he could not reasonably anticipate.'" *Sloas*, 201 S.W.3d at 479 (quoting *Lamb v. Clark*, 138 S.W.2d 350, 352 (Ky. 1940)). Thus, to be viable, the Estate's negligence claims must be premised on facts showing Jailer Tussey knew or had reason to know of Baker's need for medical attention. *Malone*, 957 S.W.2d at 200. Although the Estate alleges "Defendants knew or should have known that Mr. Baker was at risk of injury or death," Second Amended Complaint, D.E. 18, Page ID# 245, ¶ 106, as set forth above, it has not identified any facts supporting the conclusion that Jailer Tussey had such knowledge while Baker was incarcerated at the MCRJ. The Estate's single, conclusory allegation is not enough to establish a plausible basis for negligence liability.

The Estate also claims "Defendants" violated two Kentucky Administrative Regulations, 501 KAR 3:090, Section 1, which requires that a jail's medical services be provided through a contract with a licensed health care provider and prohibits the jailer from restricting health care staff in performing their duties "except to adhere to the jail's security requirements," and 501 KAR 3:060, which establishes proper observations procedure for inmates. The Second Amended Complaint, though, does not contain facts supporting the Estate's claims against Jailer Tussey. With regard to the medical services regulation, the Estate alleges WKCH supplied health care services at the MCDC, and it does not assert Jailer Tussey interfered with WKCH's efforts to do

so.  *See* Second Amended Complaint, D.E. 18, Page ID## 230, 245, ¶¶ 12, 112.  501 KAR 3:060 assigns different responsibilities to "[t]he jailer or jail administrator" versus "[j]ail personnel."  The jailer or jail administrator is required to establish certain policies and procedures to ensure the security of the jail.  *See* 501 KAR 3:060, Sections 1 and 3.  Jail personnel, on the other hand, are tasked with "conduct[ing] and document[ing] direct in-person surveillance" of prisoners.  501 KAR 3:060, Section 2.  The Second Amended Complaint does not allege Jailer Tussey failed to establish any required procedure, nor does it identify any point at which Jailer Tussey personally conducted, was responsible for conducting, or failed to conduct the requisite surveillance.  Since Jailer Tussey cannot be vicariously liable for any failure by his subordinates to conduct required observations, the Second Amended Complaint fails to allege facts sufficient to state a claim against him for violating the regulation.

Finally, even if the Estate had sufficiently pled its state-law claims against Jailer Tussey, they would be barred by qualified official immunity because decisions regarding inmates' medical care and the supervision of prisoners are discretionary, and the Estate does not allege any facts indicating Jailer Tussey acted in bad faith.  *See Peterson v. Foley*, 559 S.W.3d 346, 351 (Ky. 2018) ("Qualified official immunity applies to public officers or employees if their actions discretionary … and are made in good faith and within the scope of their authority or employment."); *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 640-41 (Ky. App. 2011) (citing *Sloas*, 201 S.W.3d 469) (deputies' decisions regarding inmate's suicide risk, including the supervision of prisoners were discretionary); *Williams v. Kenton Cnty.*, 2023 WL 2053068, at *15 (E.D. Ky. Feb. 16, 2023) (deputies' decision whether to contact medical staff was discretionary).  Training and supervising subordinate staff members is also a discretionary function.  *Morales v. City of Georgetown*, 2024 WL 4576332, at *7 (Ky. Oct. 24, 2024) (quoting

*Haney v. Monsky*, 311 S.W.3d 235, 244 (Ky. 2010)) (holding the supervision of employees was discretionary because "'supervising the conduct of others is a duty often left to a large degree—and necessarily so—to the independent discretion and judgment of the individual supervisor'"). Therefore, the Estate's state-law claims against Jailer Tussey for negligence, gross negligence, wrongful death, and negligence *per se* must be dismissed.

### IV. Any state law claims against Jailer Tussey officially or the Fiscal Court are barred by sovereign immunity.

The Estate purports to assert its negligence *per se* claim against all defendants. Second Amended Complaint, D.E. 18, Page ID## 246-47, Count V. However, "[i]t is well established that 'Kentucky counties are cloaked with sovereign immunity'" and cannot, "absent a legislative waiver of immunity, … be held vicariously liable in court for the ministerial acts of [their] agents, servants, and employees." *Edmonson Cnty. v. French*, 394 S.W.3d 410, 414 (Ky. App. 2013) (quoting *Lexington-Fayette Urban County Gov't v. Smolcic,* 142 S.W.3d 128, 132 (Ky. 2004)); *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 163 (Ky. 2003). Sovereign immunity "is meant to shield its possessor not simply from liability but from the costs and burdens of litigation as well." *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 888 (Ky. 2009). "Unless the fiscal court waives its immunity, sovereign immunity protects the fiscal court from state-law claims." *Doe v. Magoffin Cnty. Fiscal Court*, 174 Fed. App. 962, 971 (6th Cir. 2006) (citing *Schwindel*, 113 S.W.3d at 163). Sovereign immunity also extends to county officers sued in their official capacity. *French*, 394 S.W.3d at 414; *see also Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 773 (E.D. Ky. 2019) (sovereign immunity barred claims against county, fiscal court, detention center, and individual defendants in their official capacities). Because neither the Kentucky General Assembly nor the Madison County Fiscal Court has waived Madison

County's sovereign immunity, any state-law claims against Jailer Tussey in his official capacity and the Fiscal Court must be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Madison County Defendants respectfully request the Court grant their motion and dismiss with prejudice all claims asserted against them herein.

Respectfully submitted,

/s/ D. Barry Stilz
D. Barry Stilz
Lynn Sowards Zellen
James E. Yeager III
Kinkead & Stilz, PLLC
301 East Main Street, Suite 800
Lexington, KY   40507
bstilz@ksattorneys.com
lzellen@ksattorneys.com
jyeager@ksattorneys.com
Telephone: (859) 296-2300
Facsimile: (859) 296-2566
*Counsel for the Madison County Defendants*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that true and correct copies of the foregoing have been served via CM/ECF on this, the 21st day of November, 2024.

/s/ D. Barry Stilz
*Counsel for the Madison County Defendants*