UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| PENNY BAKER, Administratrix of the Estate of Brandon Baker, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 24-240-DCR |
| V. | ) ) | |
| MADISON COUNTY FISCAL COURT, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendants Madison County Fiscal Court's ("Madison County") and Madison County Jailer Steve Tussey's ("Tussey") motion to dismiss the Second Amended Complaint filed by Plaintiff Penny Baker, as Administratrix of the Estate of Brandon Baker. [Record No. 20][1] For the foregoing reasons, the motion to dismiss will be granted, in part, and denied, in part.

**I.**

On July 18, 2023, Brandon Baker was placed into the Madison County Detention Center ("MCDC") custody following charges of public intoxication and illegally possessing of a controlled substance.[2] [Record No. 18, ¶ 24] Later that morning (8:55 a.m.), Baker was

---

[1]  Defendant Lieutenant James Hollins has also moved to dismiss the claims asserted against him. [Record No. 39]  However, his motion is not ripe for consideration at this time.

[2]   The Court construes the Complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *See Evans–Marshall v. Bd. of Educ.,* 428 F.3d 223, 228 (6th Cir. 2005).

struggling to stand in his cell and a guard allowed Baker to use his arm to pull himself up. [*Id.*, ¶ 27] Several minutes later (9:12a.m.), a guard entered Baker's cell with a clean pair of pants, and asked Baker to change because he had defecated on himself. [*Id.*, ¶ 28]

At 5:27 a.m. the following day, a guard entered Baker's cell and told him to roll over so he could help him stand. Baker informed the guard he could not get up. The guard responded: "I know that's why I'm going to help you." The guard attempted to help Baker stand and Baker advised him to be careful because he was sore. The guard then informed Baker that he would get a wheelchair. The guard returned two minutes later with a wheelchair and left the cell with Baker. [*Id.*, ¶ 30] Baker did not eat dinner at 5:00 p.m. that afternoon; however, this failure was not documented. [*Id.*, ¶ 32]

Baker did not eat breakfast on July 19 (6:30 a.m.) but again, this failure was not documented. [*Id.*, ¶ 35] At 7:07 a.m., Baker began vomiting. Eleven minutes later he asked another inmate to call a guard. [*Id.*, ¶ 37] And at 8:55 a.m., another inmate ("Bobby") informed the guards that Baker needed medication; however, none was provided. [*Id.*, ¶ 38] Lunch was served at 11:30 a.m., but Baker did not eat any of the meal. And this failure was not documented. Baker remained stationary until 5:07 p.m. when he got "down to go to the restroom." At that point, several inmates indicated they were worried about his condition and asked if he was ok.

Early the next morning (1:52 a.m.), inmate Bobby called the guards because Baker was "violently ill" and needed help immediately because he was vomiting and defecating on himself. [*Id.*, ¶ 42] Bobby allegedly told other inmates in the cell that Baker would likely not survive much longer unless the guards got Baker some help. Another inmate ("Thomas")

- 2 -

attempted to call the guards, yelling: "I mean, what's it take to get you to call a f*cking ambulance?"  [*Id.*]

At 2:00 a.m. a guard asked for the sick inmate's name, and the other inmates identified Baker.  [*Id.*]  Thomas called the guards for help again several minutes later by screaming and kicking the door.  [*Id.*, ¶ 43] Two guards entered the cell approximately eleven minutes later, with one leaving shortly thereafter to get Baker a clean change of clothes.  [*Id.*]  The guard returned with the clean clothing, and both guards waited for Baker to change.  [*Id.*]  While they waited, the inmates told the guards that no one had checked on Baker for two days and the guards had allowed Baker to lay in bed and starve.  [*Id.*]  The guards did not respond and left the cell.  [*Id.*]

At 2:19 a.m., the guards returned with a wheelchair which was used to put Baker into cell ISO 035.  [*Id.*, ¶ 44] Baker informed a trustee who had entered the cell to deliver a mat that he still needed help, and that he had not received any assistance when he was vomiting and defecating on himself twenty minutes earlier.  [*Id.*]  The trustee exited the cell without responding.  [*Id.*]

Baker did not eat breakfast on July 20 (5:45 a.m.).  This failure was not documented.  [*Id.*, ¶ 46] A guard entered the cell around 7:18 a.m. and provided Baker with medication and checked his blood pressure.  However, he did not otherwise secure any medical attention for Baker.  [*Id.*, ¶ 48] At 9:36 a.m., Baker fell out of the chair in which he was sleeping, and the chair subsequently fell on him.  Baker did not move and appeared to be unconscious when his cellmate moved the chair.  [*Id.*, ¶ 49] A nurse called to check on Baker at 10:55 a.m.  When Baker did not respond, the two guards and nurse entered his cell.  [*Id.*, ¶ 50] In response to

their questioning, Baker responded that he was "coming off" suboxone.  After checking Baker's blood pressure and heart rate, the nurse and guards left the cell without any further medical intervention.  [*Id.*]  Baker did not eat lunch that day (11:00 a.m.) or dinner six hours later but these failures were not documented.  [*Id.*, ¶¶ 51, 52]

Breakfast was served at 5:48 a.m. the next morning, but Baker did not eat any of the meal.  Again, MCDC did not document this failure.  [*Id.*, ¶ 54] Lunch arrived at 11:25 a.m. Baker took a bite but gave the rest of the meal to his cellmate.  [*Id.*, ¶ 56] This failure was not documented.

Baker's cellmate called for a nurse at 4:34 p.m. because Baker was having seizures. [*Id.*, ¶ 57] A guard entered, informed Baker he was on the detox list, asked him what his symptoms were, and then left.  [*Id.*]  The guard returned and administered medication to Baker, telling him before leaving that "'heroin's terrible coming off it, it is terrible, you feel like you're gonna die but you won't.'"  [*Id.*]  Baker took one bite of his dinner at 5:43 p.m. but gave the rest to his cellmate.  [*Id.*, ¶ 58] Medical staff did not check on Baker on July 22.

At 3:03 a.m. on July 23, Baker repeatedly called for a guard.  [*Id.*, ¶ 61] Baker's cellmate became belligerent on Baker's behalf.  Both told guards they had been asking for water for hours but had received no response.  Two guards entered the cell and argued with Baker's cellmate, then exited without taking any action.  [*Id.*]

At 4:15 a.m., Baker told his cellmates he could not move and asked that they help him up.  [*Id.*, ¶ 62] However, their efforts were to no avail.  A guard entered to assist in sitting Baker against the bed and left shortly thereafter.  [*Id.*]  A little over two hours later, Baker's cellmate ate Baker's breakfast (again, not documented).  [*Id.*, ¶ 63] At 8:42 a.m., a nurse

- 4 -

brought Baker medication and asked if he was feeling better. Baker answered in the negative. [*Id.*, ¶ 65] Lunch was served at 11:40 a.m. Baker asked for the "water mix" and gave the rest of his lunch to his cellmate. The failure to eat was not documented. [*Id.*, ¶ 66] And at 7:00 p.m., Baker gave away his dinner, which was not logged or recorded by staff. [*Id.*, ¶ 67]

At 5:56 a.m. on July 24, Baker's cellmate banged on the cell door while calling for assistance from a guard. [*Id.*, ¶ 69] Upon entry, the cellmate advised the guard that he was angry because Baker was lying on the floor, and he did not want to have to step over him to use the bathroom. [*Id.*, ¶ 69] When asked, Baker told the guard he was unable to move. [*Id.*] The guard indicated he would return and move Baker after the cellmate threatened to "put his hands on" him. Five minutes later, the guard returned, moving Baker and his mat before leaving. [*Id.*] A guard delivered breakfast at 6:17 a.m. and asked Baker whether he was eating. Baker responded no and indicated that he needed medical attention (specifically, "I need help," "help," and "get help"). [*Id.*, ¶ 70]

Soon thereafter, a male guard entered the cell, asking if Baker would like his tray again to which Baker responded in the negative. The guard indicated that he would send the nurse when she arrived in the next 15-20 minutes; however, a nurse did not come as indicated. [*Id.*, ¶ 71] At 10:42 a.m., the same female guard who had delivered Baker's breakfast that morning returned with lunch. But again, Baker did not eat (not documented). [*Id.*, ¶ 73] At 5:21 p.m., the guard returned to deliver dinner and asked if Baker was going to eat anything. [*Id.*, ¶ 74] Baker answered "no". The guard responded "ok" and left the cell. [*Id.*] Almost two hours later, a male guard entered the cell and asked Baker if he was ok, to which Baker responded

"no". When asked what was wrong, Baker indicated "everything." [*Id.*, ¶ 76] The guard exited the cell.

Around 5:42 a.m. the next morning, a guard delivered breakfast. Although she was required to step over Baker to hand trays to the other inmates, the guard did not acknowledge him. [*Id.*, ¶ 77] At 8:02 a.m., a nurse entered Baker's cell and checked his vital signs. When asked, Baker indicated that he still was not well. [*Id.*, ¶ 78] EMTs arrived and removed Baker from the cell forty-five minutes later. [*Id.*, ¶ 78] EMS noted Baker was found lying in his own urine and feces, tachycardic, tachypneic, and hypothermic. [*Id.*, ¶ 79] Baker died at Baptist Health Hospital in Lexington, Kentucky twenty-one days later because of "complications of Methicillin-resistant Staphylococcus aureus (MRSA) endocarditis due to intravenous drug abuse. Medical neglect was deemed a contributing factor by the state medical examiner." [*Id.*, ¶ 80] Baker's death was later ruled a homicide. [Record No. 29, p. 5]

On September 19, 2023, Michelle Stringer, the Executive Staff Advisor for the Kentucky Department of Corrections, issued a letter to Defendant Tussey informing him that after an investigation into the death of Brandon Baker, she determined that KY Jail Standards were "'violated regarding the Brandon Baker incident.'" [Record No. 18, ¶ 81] Tussey responded with a letter detailing a corrective action plan. [*Id.*, ¶ 82] The letter stated "'the shifts involved will be [c]oached on the importance of prompt observation by Major Lane. This coaching session will take place on 10/12/2023. Also, all staff receive training during annual in-service on the proper procedure for observations.'" [*Id.*]

**II.**

- 6 -

Plaintiff Penny Baker initiated this action on September 9, 2024. The plaintiff has amended her Complaint on two occasions. Count I of the Second Amended Complaint [Record No. 18] alleges deliberate indifference brought under 42 U.S.C. § 1983. More specifically, it asserts claims against the Madison County Fiscal Court, Steve Tussey, West Kentucky Correctional Healthcare (WKCH), Unknown Jail Guards, and Unknown WKCH medical doctors, nurses and/or staff for violations of Baker's Eighth and Fourteenth Amendment rights under the United States Constitution. Count II asserts a *Monell* claim brought against all defendants. In Count III, the plaintiff alleges claims of negligence, gross negligence, and wrongful death against all defendants. Count IV asserts a claim of medical negligence against WKCH and unknown defendants. Finally, Count V asserts a claim of negligence *per se* under KRS 446.070 against all defendants.

### III.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff need not offer detailed factual allegations but must provide more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must enable a court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To be plausible, a claim need not be probable, but the complaint must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* In reviewing a Rule 12(b)(6) motion, courts construe the complaint "in the

light most favorable to the plaintiff" and make "all inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

### A.

As a threshold matter, Baker was *charged* with crimes, not *convicted*. Accordingly, he was a pretrial detainee and not a convicted prisoner during the relevant time period. This distinction dictates that the alleged constitutional violations are properly analyzed under Fourteenth Amendment jurisprudence. *See Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021). To successfully plead a claim under this standard, the plaintiff must show: (1) an objectively serious medical need; and (2) that each defendant acted deliberately and recklessly in the face of an unjustifiably high risk of harm that is either known, or so obvious that it should be known. *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023).

The Second Amended Complaint alleges that the defendants exhibited deliberate indifference toward Baker by failing to comply with Kentucky jail standards concerning the observation of healthy prisoners, "much less prisoner[s] who were designated to be on a detox protocol." [Record No. 18, ¶ 85] However, the plaintiff has not pleaded any specific facts linking *Tussey* to a deliberate indifference to Baker's serious medical needs other than nebulous allegations of inadequate training, which are insufficient to sustain an individual-capacity deliberate indifference claim. And because vicarious liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Under this reasoning, the plaintiff also cannot establish deliberate indifference regarding the Madison County Fiscal Court. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A]

- 8 -

municipality cannot be held liable under § 1983 on a *respondeat superior* theory.")  Thus, the claims asserted against Madison County and Tussey in Count I will be dismissed.

**B.**

Next, the plaintiff alleges a § 1983 *Monell* claim for failure to train or supervise.  Rather than serving as a distinct *Monell* claim, alleging a failure to train or supervise serves as a means of demonstrating an unlawful policy or custom.  *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) ("One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision.") (citing *City of Canton v. Harris*, 489 U.S. 478, 387 (1989)).

A municipal government is not automatically liable for "an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.  The government as an entity is only responsible under § 1983 when "execution of a government's policy or custom" inflicts the injury in question.  *Id.*  To state a § 1983 claim for municipal liability under *Monell,* the pleadings must "connect [the offending] employee's conduct to a municipal policy or custom," *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)) and then show that the injury alleged "was incurred because of the execution of that policy," *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).  "Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. July 16, 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987)).

The Sixth Circuit has highlighted four ways of demonstrating an unlawful policy, practice, or custom: "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) *a policy of inadequate training or supervision*; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (emphasis added). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700.

Finally, "[t]here are two ways to support a claim that a failure to train or supervise is the result of a municipality's deliberate indifference." *Helphenstine*, 60 F.4th at 323. The first, and most common, is by highlighting a "pattern of similar constitutional violations by untrained employees." *Shadrick v. Hopkins County*, 805 F.3d 724, 738–39 (6th Cir. 2015). Alternately, a plaintiff can establish "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739 (quoting *Brown*, 520 U.S. at 409) (internal quotations omitted). "This sort of claim is available only 'in a narrow range of circumstances,' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Helphenstine*, 60 F.4th at 323 (quoting *Brown*, 520 U.S. at 409).

The plaintiff claims Tussey "approved, ratified, condoned, encouraged, sought to cover up, and / or tacitly authorized the continuing pattern and practice of misconduct and/or civil

- 10 -

rights violations . . . which brought about Mr. Baker's death."  [Record No. 18, ¶ 96] Further, the Second Amended Complaint contains allegations that "[t]his pattern and practice includes failure to exercise timely observation of inmates and failure to perform the observation that was performed in a legal sufficient manner."  [*Id.*]  And most importantly, it references a report detailing the violation of Kentucky Jail Standards, and a response from Tussey proposing a purported remedy to the situation.  [*Id.*, ¶¶ 81-82]

Madison County and Tussey correctly note that "violation of state law cannot form the basis for liability under § 1983, which applies only to breaches of federal law."  However, the plaintiff does not attempt to form the basis for liability with the report.  Instead, she seeks to employ it as *evidence* of an inadequate policy posing serious potential for a constitutional violation.  The moving defendants also attempt to analogize this case to others in which *Monell* claims were dismissed.  But the case at hand is distinct from *Charles v. Lee County*, 2020 WL 5369932 (E.D. Ky. Sept. 8, 2020), and *French v. Hester*, 585 F. Supp. 3d 974 (E.D. Ky. 2022), because both cases presented scenarios in which threadbare legal conclusions were alleged in lieu of relevant factual allegations.  Here, the factual allegations of the Second Amended Complaint regarding officers' indifference towards Baker, their insufficient observation procedures, and Tussey's tacit acknowledgement of such repeated violations in his response to Michelle Stringer's letter satisfy the requisite burden to survive a 12(b)(6) motion.

## C.

Counts III and V of the Second Amended Complaint allege wrongful death and negligence *per se* under state law.  The plaintiff has agreed to voluntarily dismiss her state law claims against Madison County and Tussey in his official capacity.  Thus, the Court is left to

consider only the state claims against Tussey in his individual capacity.  [Record No. 29, p. 12]

Tussey argues he is shielded from state law claims by qualified immunity. Under Kentucky law, qualified immunity protects an official sued in his or her individual capacity from tort liability resulting from the negligent performance of (1) discretionary acts,[3] (2) made in good faith, (3) within the scope of their authority.  *See Yanero*, 65 S.W.3d at 522.  The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Rowan County v. Sloas*, 210 S.W.3d 469, 475 (Ky. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  Once the official makes a *prima facie* showing that the act in question was performed within the scope of the person's discretionary authority, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith."  *Yanero*, 65 S.W.3d at 523.

"The hiring, supervision, and retention of jail employees constitute discretionary functions within the scope of … [an individual's] authority as the jailer."  *See Paul v. Whitley Cnty. Det. Ctr.*, 712 F. Supp. 3d 907, 929 (E.D. Ky. 2024) (citing *Yanero*, 65 S.W.3d at 522)). The plaintiff cites *Morales v. City of Georgetown*, 2024 WL 4576332 (Ky. Oct. 24, 2024), in contending that "Tussey's failure to comply with 501 KAR 3:060 Section 1 regarding the development of policies and procedures prisoner head counts and surveillance checks is a violation of a ministerial duty." [Record No. 29, pp. 11-12] However, in *Morales*, the Supreme

---

[3]  Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Yanero*, 65 S.W.3d at 522.  Conversely, a ministerial act is "one that requires only obedience to the orders of others, or when the [official]'s duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.*

Court of Kentucky held that an officer's complete failure to develop an operational plan constituted a dereliction of ministerial duty. And here, the plaintiff has not alleged that Tussey failed to create a plan. Instead, she alleges "a failure to promulgate appropriate operating policies in her complaint." [Record No. 29, p. 11 (citing Record No. 18, ¶¶ 27-30 and 120-123)] In addition to the pleading deficiency, the plaintiff offers no facts indicating Tussey's actions (or lack thereof) were taken in bad faith. And there is no special rule or presumption against granting motions to dismiss that applies specifically for qualified immunity. *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021). Thus, qualified immunity protects Tussey from the state claims raised in Counts III and V of the Second Amended Complaint.

## IV.

Based on the foregoing analysis, it is hereby **ORDERED** as follows:

1.      The defendants' Motion to Dismiss [Record No. 20] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order.

2.      The stay of discovery in this action is **LIFTED**. A separate Amended Scheduling Order will be forthcoming.

Dated:   March 3, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky