UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| PENNY BAKER, Administratrix of the Estate of Brandon Baker, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 24-240-DCR |
| V. | ) ) | |
| MADISON COUNTY FISCAL COURT, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants Madison County Fiscal Court ("Madison County") and Jailer Steve Tussey (in his individual and official capacity) have moved for summary judgment regarding Plaintiff Penny Baker's (Administratrix of the Estate of Brandon Baker) ("the Estate") remaining *Monell* claim. [Record Nos. 83 and 86] After considering the parties' arguments, the Court concludes that the moving defendants have discharged their burden by showing there is no genuine dispute of material fact, entitling them to judgment as a matter of law. Therefore, both motions will be granted.

## I. Background

In the middle of the night on July 18, 2023, Brandon Baker was booked into the Madison County Detention Center ("MCDC") with charges of public intoxication and illegally possessing heroin and a controlled substance. [Record No. 83-7 at 1] Baker indicated in response to the facility's standard medical questions that he would be withdrawing from

Suboxone while in custody.  [Record No. 83-8 at 1]  The only serious medical condition he identified was back problems.  *Id.*

Later that day, Baker requested Tylenol and a guard responded that he would bring some.  [Record No. 83-10, Ex. 9]  However, there is no indication that Baker was provided with Tylenol.  *Id.*  Roughly six hours later, Baker requested to see a doctor to which the guard responded that no one was there but that he would see what he could do.  *Id.*  After Baker again asked for Tylenol, the guard advised that he could not give out medicine.  *Id.*

Baker needed help to use a wheelchair to leave his cell early in the morning on his second day at MCDC.  [Record No. 83-10, Ex. 10] But later that day, he was able to walk unassisted and pour himself water.  *Id.*  There is no indication that he requested medication that day.  *See id.*

On Baker's third day at the facility, a guard came around midnight to move him from a holding cell to general population.  [Record No. 83-10, Ex. 11]  Baker told the guard that he could not move and did not know why but was ultimately able to carry his mat and walk unaided.  *Id.*  Baker indicated "Suboxone" when the guard asked from what he was detoxing. *Id.*

After vomiting around 7:00 a.m., Baker spent most of his day on his bed but also moved around unassisted and interacted with cellmates.  [Record No. 83-10, Ex. 12]  By this point, Registered Nurse Martha King (an employee of MCDC's medical services contractor West Kentucky Correctional Healthcare) was aware that Baker was exhibiting symptoms of opioid withdrawal but observed that he was "able to speak and move freely without complication." [Record Nos. 83-4 at 4 and 83-11 at 2]  King started Baker on the detox protocol which included "standing medication orders and monitoring" his vitals. [Record No. 83-1 at 4 (citing

Record Nos. 83-3 at 7 and 83-11 at 2).]  Five days passed before King again interacted with Baker.  [*See* Record No. 83-11 at 2.]

After midnight on his fourth day in custody, cellmates realized that Baker had defecated on himself.  [Record No. 83-10, Ex. 14] A guard brought Baker new pants and cellmates helped him get up and walk to the shower.  *Id.*  Shortly thereafter, guards arrived and removed Baker from the shower, transporting him by wheelchair to an isolation cell.  *Id.*; [Record Nos. 83-9 and 83-10, Ex. 15].

Medical staff checked Baker's vitals and administered ibuprofen and anti-nausea medicine early the following morning.  [Record No. 83-10, Ex. 15]  Roughly four hours later, they checked his vitals a second time.  *Id.*  The nurse on duty confirmed that Baker was in withdrawal and on detox protocol.  *Id.*

A cellmate notified either a guard or a medical staff employee late in the afternoon on Baker's fifth day in custody that he was having seizures.  [Record No. 83-10, Ex. 16]  The staff member commiserated with Baker, noting that opiate withdrawal is miserable and encouraged him to sit up and take his medicine.  *Id.*

Medical staff offered Baker medication during the morning of his sixth day at MCDC and he was able to sit up and swallow it.  [Record No. 83-10, Ex. 17] But Baker indicated he was not feeling better when asked.  *Id.*  However, there is no indication that he requested heightened medical attention.  *See id.*

Baker's cellmate was upset that Baker was lying in the middle of the floor early in the morning on his seventh day in custody.  [Record No. 83-10, Ex. 18]  When the guard arrived, Baker told him that he could not move, so the guard pulled his mat out of the walkway.  *Id.*  Later that evening, and after being asked by a guard if he was okay, Baker responded that

everything hurt. *Id.* Soon thereafter, a medical staff employee offered Baker his medication which he appeared to take. *Id.*

On Baker's eighth and final day at MCDC, a fellow on-duty nurse asked King to check on Baker in the morning soon after King arrived. [Record No. 83-11 at 2] Upon examination, King observed that his "condition was much different" than when she had seen him five days earlier. *Id.* Although Baker's vitals alone were not a cause for concern, King testified that his breathing was labored, his eyes and face were sunken, and his skin was grayish in color. *Id.*; [Record No. 83-3 at 2–3] King contacted the medical provider on duty and EMS was called to take Baker to a nearby hospital. [Record No. 83-11 at 2]

Upon arrival, EMS personnel observed that Baker was hypothermic with an oral temperature of 93.4 degrees Fahrenheit and that he was "lying in his own urination and feces." [Record No. 83-12 at 3–4] Baker was admitted into the hospital's intensive care unit and treated "for decubitus ulcers, as well as multiple other medical issues including methicillin resistant *Staphylococcus aureus* (MRSA) sepsis, rhabdomyolysis, renal failure, and a possible small bowel obstruction." *Id.* at 3. He tragically died after twenty days of hospitalization. *See id.* State Medical examiner Doctor Meredith Frame concluded that Baker passed away from "complications of methicillin-resistant *Staphylococcus aureus* (MRSA) endocarditis due to intravenous drug use" which included him suffering a stroke. *See id.* at 2–3. Frame also found medical neglect to be a contributing factor. *Id.* at 4.

The day before Baker was transported to the hospital, Michelle Stringer with the Kentucky Department of Corrections ("DOC") sent a death-review letter (concerning former MCDC inmate Jordan Hall) to Jailer Tussey which noted cell check frequency violations under 501 KAR 3:060. [Record No. 83-15 at 1–2] After Baker passed away, the DOC sent an

additional letter, citing cell check frequency violations and that window observations were conducted rather than in-cell, in-person checks. [Record No. 83-13 at 1–2] Before that letter, MCDC had never been cited or told that checks could not be done *via* the window but, instead, required entry into the cell. [Record No. 83-1 at 20]

The Court dismissed the following claims against Madison County and Tussey in the Estate's Second Amended Complaint in a prior Memorandum Opinion and Order: deliberate indifference under 42 U.S.C. § 1983, negligence, gross negligence, negligence *per se*, and wrongful death. [Record Nos. 18 and 41] Thus, the Estate's sole surviving claim against those defendants is a *Monell* claim.[1] [*See* Record No. 18.]

Defendant Madison County moved for summary judgment on the Estate's *Monell* claim. [Record No. 83] Defendant Jailer Tussey (in his individual and official capacity) incorporated Madison County's arguments into his own motion for summary judgment. [Record No. 86] Madison County also moved to exclude the testimony and opinions of the Estate's expert Medical Examiner Frame and Registered Nurse King. [Record Nos. 84 and 85] The Estate did not contest the motion concerning King but challenged the exclusion of Frame. [*See* Record No. 91.] The Court granted the plaintiff's motion for leave to tender that response late. [Record No. 93] But the defendants moved to strike the Estate's response and

---

[1]    Despite bringing claims against various corrections officers who were present during Baker's stay at MCDC, there is no indication that any were served except James Hollins. [*See* Record No. 37.] And when the Estate failed to respond to Hollins' motion to dismiss, the parties agreed to dismiss the claims against him. [Record Nos. 39 and 48] Notwithstanding the Clerk of Court issuing summonses on December 20, 2024, the Estate never provided proof of service for Defendants Deanna Anglin, Austin Pingleton, Jessica Redance, and Kenneth Webb, nor did counsel enter an appearance on their behalf. [Record No. 32] As a final procedural matter, the Estate previously settled with the West Kentucky Correctional Healthcare, LLC defendants. [Record No. 72]

to vacate the Court's order allowing the late response, contending it was three days late—not two minutes as represented. [Record Nos. 95 and 96] The Court granted the motion to vacate and allowed the motions for leave and to strike to be fully briefed. [Record No. 97]

## II. Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Toms v. Taft*, 338 F.3d 519, 523 (6th Cir. 2003). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 247 (1986). To be sure, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. In resolving a motion for summary judgment, the court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

To survive summary judgment, the nonmoving party must support its assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record." Fed R. Civ P. 56(c)(1)(A). Alternatively, it may show that the moving party's materials cited "do not establish the absence . . . of a genuine dispute." *Id.* at (c)(1)(B).

## III. Analysis

### Deliberate Indifference

For a deliberate indifference claim, a pretrial detainee must show: (1) he or she had an objectively serious medical need; and (2) that each defendant acted deliberately and recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should

be known.[2] *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023). Because this test requires an individualized inquiry, it must be applied to each defendant. *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022).

Herein lies the issue for the Estate. While the parties agree that Baker had a serious medical need, the Estate does not provide sufficient or specific evidence that would allow the Court to engage in an individualized inquiry with respect to each officer's actions. As the moving defendants argue, the Estate "has not elicited any evidence identifying the various officers who interacted with and observed Baker during his incarceration." [Record No. 83-1 at 13–14 (citing *Jones v. Muskegon Cnty.*, 625 F.3d 935, 942 (6th Cir. 2010)).]

Further, Baker was under the care of medical providers who determined that he was experiencing opioid withdrawal. Thus, it would be even more difficult for Baker to show jail staff violated his rights because "[g]enerally, 'non-medically trained officer[s]' do not act with deliberate indifference to a detainee's medical needs when they reasonably defer to a medical professional's diagnosis or treatment." *Grote*, 85 F.4th at 412 (quoting *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017)). Accordingly, no reasonable juror could conclude that any MCDC staff was deliberately indifferent to Baker's serious medical needs. *See id.* at 413.

---

[2]    The moving defendants appear to reference the subjective standard for pretrial detainees which has since been rejected by the United States Court of Appeals for the Sixth Circuit. [Record No. 83-1 at 13 (referencing "the subjective prong of the deliberate indifference test") at 20 ("[T]he inquiry turns on the subjective prong of the deliberate indifference framework.") (citing *Slone v. Lincoln Cnty.*, 242 F. Supp. 3d 579, 592 (E.D. Ky. 2017)); *see e.g.*, *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 405 (6th Cir. 2023). That said, the requirement for an *individualized inquiry* was not altered and still applies to the objective standard. *See Mercer v. Athens Cnty., Ohio*, 72 F.4th 152, 161 (6th Cir. 2023). Thus, it makes no difference that the wrong standard was cited here.

So too for the medical staff.  Although the Estate references King's treatment of Baker on his third and eighth day at MCDC, several other members of the medical staff provided care.  However, those individuals are not identified in the record by the Estate, preventing the Court from conducting the necessary individualized inquiry.  To be sure, the Estate references medical staff employee James Dake's deposition, but its citation is erroneous and the undersigned is unable to find Dake's deposition in the record.  [*See* Record No. 90 at 9.]  Nor does it provide evidence showing that King was deliberately indifferent.  The record indicates that King saw Baker on his third and eighth (and final day) at MCDC.  She started with the detox protocol, and when she saw him again five days later, his condition resulted in her having EMS transport him to a hospital.  During the intervening days, the Estate fails to identify any specific medical staff member or specific action that demonstrates deliberate indifference.  Nor does the Estate reference evidence of King's actions or inactions which supports that she was deliberately indifferent to Baker's serious medical needs.

That is not the end of the inquiry, however.  It remains "proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer."  *Grote*, 85 F.4th at 414 (collecting cases).  Thus, the plaintiff's *Monell* claim will be evaluated.

### *Monell* Claim

Ordinarily, Section 1983 creates liability against *persons* who cause deprivations of constitutional rights.  That said, liability may extend to a governmental entity under § 1983 when its official custom or policy causes a violation of constitutional rights.  *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691 (1978).

To "avoid de facto *respondeat superior* liability explicitly prohibited by *Monell*," a plaintiff must demonstrate that the custom or policy was the "moving force" behind the constitutional violation.  *See Monell*, 436 U.S. at 691–92, 694 (citation modified); *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495 (6th Cir. 1996).  "Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. July 16, 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987)).

Where a plaintiff cannot "demonstrate that a written policy exists, he or she 'may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 543 (6th Cir. 2004) (quoting *Monell*, 436 U.S. at 691).  To do this, "a plaintiff can identify (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015).

Succeeding on a failure to train or supervise claim requires a plaintiff to "prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  "There are two ways to support a claim that a failure to train or

supervise is the result of a municipality's deliberate indifference." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 323 (6th Cir. 2023). The first, and most common, is by highlighting a "pattern of similar constitutional violations by untrained employees." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015).

Alternately, a plaintiff can establish "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick*, 805 F.3d at 739 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)) (internal quotations omitted). "This sort of claim is available only 'in a narrow range of circumstances,' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Helphenstine*, 60 F.4th at 323 (quoting *Brown*, 520 U.S. at 409).

In this case, the Estate advances two *Monell* theories: first, Madison County had an unconstitutional policy regarding inmate observations which permitted them to be untimely and cursory; and second, Madison County failed to properly train and supervise jail staff to perform in-person cell checks or "to distinguish medical distress from detox symptoms." [Record No. 90 at 8, 10] Specifically, it claims that, had the 20-to-60-minute interval checks (in compliance with 501 KAR 3:060) been conducted with jail staff entering the cell, "Baker's critical deterioration would have been obvious" and that a "single in-person observation would have revealed [Baker's condition which was] inconsistent with detoxification." *Id.* at 11. It further suggests that there was a lack of "escalation protocol requiring supervisors to intervene when vital signs remained normal while clinical presentation worsened" which would have triggered interventions for Baker as his condition worsened during his jail stay. *Id.* at 5.

The Estate insists that Madison County's actions and inactions were the moving force behind Baker's death. [Record No. 90 at 10] It argues that Madison County created the risk when it did not require officers to enter cells because it prevented them from detecting serious medical decline. *Id.* at 11. Because the DOC issued letters of noncompliance concerning three deaths at MCDC, the Estate asserts that the jail was on notice that more training was needed. *Id.* at 9.

Madison County contends that the Estate has no failure-to-train claim because it fails to provide evidence that: (1) MCDC had an unconstitutional policy of infrequent or window only checks; (2) Madison County was deliberately indifferent to the need for more training on inmate observations; (3) Madison County was on notice (or should have been) about a pattern of constitutional violations concerning cell checks; or (4) any policy or training deficiency caused Baker's death. [Record No 102 at 5–12] It spends considerable time in its reply addressing a litany of errors/misrepresentations of fact and citation in the Estate's response. *See id* at 2–4. Having reviewed the parties' briefs and the exhibits in the record, the undersigned agrees with the accuracy of the moving defendants' factual corrections. Such inaccuracies not only make the Court's task more difficult, but they also undermine the credibility of the party's arguments overall.

In this case, the Estate fails to demonstrate the threshold requirement: that MCDC had an unwritten policy of conducting untimely cell checks. Although it cites the DOC's post-death review letters (for Hall and Baker's deaths) which indicate that MCDC failed to conduct cell checks at the requisite 20- or 60-minute intervals, those letters are insufficient to show an unofficial policy that "'is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Cash*, 388 F.3d at 543 (quoting *Monell*, 436 U.S. at 691).

It is worth noting that the letter regarding Hall was not dated until the day before Baker was transported to the hospital.  And the undersigned could not locate the purported Fryer letter (September 2023) in the record, and the Estate's provided citation does aid in that endeavor.  [Record No. 90 at 9]  In any event, Baker's letter  and Fryer's purported letter were dated *after* Baker's death.  So even assuming that the infrequent checks were so well settled to have the force of law, the Estate does not identify evidence showing a pattern of similar constitutional violations.  This is important because it must demonstrate that Madison County was on notice (or should have been) concerning the need for more training but was deliberately indifferent to that need.

The Estate references Tussey deposition and represents that he said the lack of timely cell checks were a "reoccurring issue."  [Record No. 90 at 9]  But again, the citation leads to nowhere and the only portion of Tussey's deposition provided in the record concerns potential overcrowding at the MCDC.  [*Compare* Record No. 90 at 9 *with* Record No. 83-21 at 1–4.]

Even assuming that the lack of in-person checks was so settled to have the force of law, the Estate does not provide specific evidence demonstrating that there is a dispute of material fact concerning whether guards checking on inmates through the window amounted to deliberate indifference.  First, there is no evidence that MCDC has any notice that in-person checks were necessary to comply with the regulation before it received Baker's post-death review letter.  Second, as the moving defendants argue, failing to follow a statue or regulation is not *prima facie* evidence of deliberate indifference to his serious medical needs.

Instead, the Estate must demonstrate a dispute of material fact concerning whether the lack of in-person checks was the moving force behind Baker's constitutional injury.  The Estate's lack of evidence showing that the absence of in-person checks *caused* Baker's injury

is fatal to its claim.  [*See* Record No. 102 at 13 (citing *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 452 (6th Cir. 2020) (finding no causation where the plaintiff "offered no evidence to establish when the notes were written or how long it took to fashion the noose, and there is no evidence that the approach taken led to the failure to notice any activity taken by [the inmate] that would have indicated he was at risk").]  To be sure, the Estate claims that "deputies and detainees repeatedly reported that Baker 'looked like he was dying,'" but again, its citation for this proposition leads to nowhere.  [*See* Record No. 90 at 11.]  So too for its claim that King testified that medical staff saw Baker on the floor but did not perform a hands-on examination. *See id.*

The moving defendants provided evidence that a medical staff member was present *in Baker's cell* the evening before but did not escalate his care from detox protocol.  And Chief Deputy Jones testified that officers could see and hear everything while observing inmates from the windows.  [Record No. 102 at 13 (citing Record No. 83-18).]  Thus, because even medical staff could not ascertain that Baker's medical care needed escalating, the Estate has not shown how a guard entering the cell to conduct a check (rather than a window check) would result in a different outcome.  In short, the Estate has not shown when Baker declined or when an officer would or should have noticed his decline had that officer checked at the requisite interval or conducted an in-person check instead of a window check.

As Madison County argues, even King noted Baker's vital signs were normal on the morning she called for him to be transported to the hospital.  [Record No. 102 at 12–13]  And medical staff gave Baker medication shortly after 7:00 p.m. the day before (which he apparently took).  [Record No. 83-1 at 5–6 (citing Record No. 83-10).]  Here, medically trained staff did not notice an escalation of symptoms until the morning.  In short, even if the Estate

could satisfy the other elements of its failure-to-train claim, it does not provide evidence demonstrating that failing to conduct 20-minute or in-person checks was the moving force behind Baker's injury.

Simply put, it is not enough for the Estate to point to a violation of a policy or statute to demonstrate causation under *Monell*.  *Bardley v. City of Ferndale*, 148 Fed. App'x 499, 507–08 (6th Cir. 2005) ("the violation of a city policy is not in and of itself a constitutional violation under 42 U.S.C. § 1983") (citing *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

What happened to Baker is undeniably tragic.  But both medical staff and officers "reasonably believed" his symptoms were caused by opioid withdrawal and lacked reason to believe he was experiencing endocarditis as his symptoms were not clearly inconsistent with [opioid] withdrawal."  *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *3 (6th Cir. Feb. 10, 2022); *Stewart v. Hensley*, Civil Action No. 0:20-008-DCR, 2023 WL 12091143, at *1 (E.D. Ky. Jan. 13, 2023).  That they were ultimately wrong, or partially wrong (as Baker was likely suffering from both withdrawal and endocarditis), does not transform that error into a violation of constitutional magnitude.  *Id.* (noting that a nurse's failure to escalate medical care for detox symptoms along with an increased heart rate and temperature caused by endocarditis did not amount to deliberate indifference); *Farthing v. Bluegrass Reg'l Recycling Corp.*, Civil Action No. 5:20-277-CHB, 2023 WL 6395583, at *18 (E.D. Ky. Sept. 29, 2023).

Finally, to the extent that the Estate argues that the events surrounding Baker's death rise to single-incident *Monell* liability—that argument fails.  To demonstrate such a claim, the Estate must bring evidence that death was "a highly predictable consequence" of a failure to equip staff with specific tools to handle individuals on detox protocol whose symptoms

- 14 -

escalate.  *Helphenstine*, 60 F.4th at 323 (citing *Brown*, 520 U.S. at 409).  And that it has not done.

In addition to requiring 20-minute checks for sick inmates, MCDC 2021–2022 Policy & Procedure Manual allowed inmates to submit medical complaints for review by staff. [Record No. 83-1 at 2]  Medical staff were required to provide medical attention at least three times per week to sick inmates.  *Id.*  In 2023, Nurse King was on site Monday through Friday from 7:00 a.m. to 3:00 p.m., and a paramedic was present from 7:00 a.m. to 7:00 p.m. daily. *Id.*  Two medical providers were always on call.  *Id.*  Jail staff also received training on MCDC's policies and procedures, first aid and CPR, and recognizing and responding to medical emergencies.  *Id.*

The present record demonstrates that staff could (and did) contact medical staff when Baker's symptoms escalated.  It also shows that staff asked Baker whether he wanted to see medical.  Although the Estate claims that there should be some method for assessing those in custody who have typical vital signs but display deteriorating symptoms, it does not show that the present procedures were somehow inadequate to that end.

### IV. Conclusion

Based on the foregoing, it is hereby **ORDERED** as follows:

1.    Defendant Madison County Fiscal Court's Motion for Summary Judgment [Record No. 83] is **GRANTED**.

2.    Defendant Jailer Steve Tussey's Motion for Summary Judgment (in his individual and official capacity) [Record No. 86] is **GRANTED**.

3.    Defendant Madison County Fiscal Court's Motions to Exclude [Record Nos. 84 and 85] are **DENIED** as moot.

- 15 -

4.    Plaintiff Penny Baker's Motion for Leave [Record No. 92] is **DENIED** as moot.

5.    Defendants Madison County Fiscal Court and Jailer Steve Tussey's Joint Motion to Strike [Record No. 95] is **DENIED** as moot.

6.    The trial scheduled to begin March 3, 2026, is **CANCELED**.

7.    The plaintiff is directed on or before **February 2, 2026**, to **SHOW CAUSE** why Defendants Deanna Anglin, Austin Pingleton, Jessica Redance, and Kenneth Webb should not be dismissed under Rule 4(m) of the Federal Rules of Civil Procedure for failing to complete service within the time allowed.

Dated:  January 26, 2026.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky